**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 23-CV-81264-RAR**

**BERNARD FERGUSON**,

       Plaintiff,

v.

**PALM BEACH COUNTY**
**SHERIFF'S DEPARTMENT OF**
**CORRECTIONS**, *et al.*,

       Defendants.

_____/

**ORDER GRANTING DEFENDANTS' CONSOLIDATED**
**MOTION FOR SUMMARY JUDGMENT**

"The opioid crisis is the worst addiction epidemic in American history."[1]  And Plaintiff, Bernard Ferguson, is caught in its grip.  To treat his opioid addiction, Plaintiff relies on buprenorphine-naloxone (or "Suboxone"),[2] a medication that reduces the cravings and painful symptoms associated with opioid use disorder.  For some time, Plaintiff treated his addiction by diverting Suboxone from a fellow inmate at the West Detention Center in Belle Glade, Florida—at least until a nurse placed Plaintiff on a fourteen-day Suboxone treatment plan.  But when officials learned that Plaintiff had previously funneled the medication, Plaintiff's treatment plan was promptly cancelled after four days of Suboxone administrations.  Plaintiff claims that he

---

[1]  James Nachtwey et al., *The Opioid Diaries*, TIME (last visited May 27, 2025), https://time.com/james-nachtwey-opioid-addiction-america/.

[2]  Buprenorphine is available in two forms: either alone, or in combination with naloxone, an opioid receptor antagonist.  The brand name for buprenorphine-naloxone is Suboxone®.  *See Medications for Opioid Use Disorder*, NAT'L INST. DRUG ABUSE (last visited May 27, 2025), https://nida.nih.gov/publications/research-reports/medications-to-treat-opioid-addiction/efficacy-medications-opioid-use-disorder.  The Court refers to buprenorphine and Suboxone interchangeably.

suffered withdrawals as a result, so he sued his medical provider, Defendant Ronald Waits, ARNP; along with Imtiaz Mohammed, ARNP; Sergeant Honray Fairclough; Sheriff Ric L. Bradshaw; and the Palm Beach County Sheriff's Office, alleging medical deliberate indifference and disability discrimination.

Discovery has ended, and before the Court is Defendants' Consolidated Motion for Summary Judgment and Incorporated Memorandum of Law ("Motion"), [ECF No. 92], along with Defendants' Joint Statement of Material Facts ("Def.'s JSMF"), [ECF No. 91]. After the Court granted Plaintiff an out-of-time response, [ECF No. 125], Plaintiff filed a Response and Memorandum of Law in Opposition ("Response"), [ECF No. 129], and a Response to Defendant's Statement of Material Facts ("Pl.'s SMF"), [ECF No. 130]. Defendants have not yet replied. Having carefully considered the Motion, the record, and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** that the Motion is **GRANTED**.

## BACKGROUND

The Palm Beach County Sheriff's Office ("PBSO") establishes guidelines for all medical services, including special medical programs, to satisfy federal and state accreditation standards and regulations. *See* Castillo Aff., Corr. Op. P. [ECF No. 90-14], at 16, 22, 25. Its operating procedures apply to PBSO personnel and its Contracted Health Care Services Provider, Wellpath, LLC ("Wellpath"). *See id.* ¶ 7. "All inmates in special management are provided prescribed medication" at PBSO facilities. Def.'s JSMF ¶ 65. The PBSO has never had a policy which allowed a deputy, corrections officer, or PBSO staff to control an inmate's medication. *See id.* ¶ 66. Rather, medications are administered by properly licensed professionals. *See id.* ¶ 67. The PBSO further requires its health authority to "develop a treatment plan for each inmate who requires a special health care program." *See* Castillo Aff., Corr. Op. P. at 25. For inmates suffering

from chemical dependency, their detoxifications are performed under medical supervision, and "their treatment plan is designated by the health authority." *Id.* at 27. Inmates "have access to substance disorder information, education and/or chemical dependency treatment programs." *Id.*

## I.     The Medication Assisted Patient Services ("MAPS") Program

The Palm Beach West Detention Center in Belle Glade, Florida provides a program called Medication Assisted Patient Services ("MAPS"). *See* Def.'s JSMF ¶ 13. The MAPS program includes detoxification therapy for inmates suffering from opioid use disorders. *See id.* The MAPS program contains <u>both</u> a behavioral therapy component <u>and</u> a medication-assisted therapy component. *See id.* ¶ 15. The Research & Recovery Network ("Network") initially interviews, screens, and approves inmate participation in the MAPS program. Then, the Network refers those inmates to Wellpath medical staff who, after clearing those inmates for entry into the program, prescribe any necessary detoxifying medications (like Suboxone) as part of the MAPS program's medication-assisted therapy component. *See id.* ¶¶ 13, 15. An inmate need not enroll in the MAPS program to receive a Suboxone prescription. Some inmates at the West Detention Center are not in the MAPS program but still have prescriptions for Suboxone when medically required. *See id.* ¶ 69.

## II.     Plaintiff's Medical History

Plaintiff arrived at the West Detention Center on January 11, 2023. *See* Second Am. Compl. ("SAC"), [ECF No. 53], at 6. On February 8, 2023, Plaintiff was psychiatrically evaluated by Dr. Charles J. Dack. *See* Def.'s JSMF ¶ 18. Dr. Dack diagnosed Plaintiff with alcohol dependence with alcohol-induced mood disorder, chronic post-traumatic stress disorder, opioid dependence with opioid-induced mood disorder, stimulant dependence with stimulant-induced mood disorder, and cocaine dependence with cocaine-induced mood disorder. *Id.* ¶ 20.

Plaintiff was seen for the first time by Defendant Ronald Waits, ARNP on July 31, 2023. *See id.* ¶ 21.  Waits learned that Plaintiff had been prescribed Percocet for an ankle fracture, after which Plaintiff had progressed to higher doses of Roxicodone and, eventually, Heroin and Fentanyl inhalation.  *See id.*  Waits diagnosed Plaintiff with a severe opioid use disorder under a fair degree of control.  *See id.*  At this meeting, Plaintiff admitted to Waits that he had been diverting another inmate's buprenorphine prescription.  *See id.* ¶ 23.  A separate urinalysis drug screening conducted that same day, which Waits signed, confirmed that Plaintiff tested positive for buprenorphine and negative for all other substances.  *See id.* ¶ 30; Urinalysis Results, [ECF No. 90-11], at 1.

Waits medically cleared Plaintiff for participation in the MAPS program to assist Plaintiff's recovery.  *See* Def.'s JSMF ¶ 22.  Waits further prescribed Plaintiff Suboxone to reduce Plaintiff's opioid cravings as part of the MAPS program's medication-assisted therapy component.  *See id.* Before Plaintiff's appointment with Waits, Plaintiff had not been on any opioid maintenance treatment plan for the 203 days during which he resided at a PBSO facility.  *See id.* ¶ 33.  Plaintiff signed an informed consent form for buprenorphine administration, [ECF No. 90-9], as well as a Wellpath Agreement for Opioid Treatment, [ECF No. 90-10].  In relevant part, the Agreement affirmed Plaintiff's understanding that any misuse or diversion of the medication—or continued disciplinary infractions—may result in termination of treatment.  *See* Def.'s JSMF ¶¶ 27–28.

After the Network informed Waits that Plaintiff was approved for entry in the MAPS program, Waits ordered Suboxone for Plaintiff.  *See id.* ¶ 32; Provider Order, [ECF No. 90-12] at 1.  Plaintiff's prescription—known as an "initial induction dose"—was for 2 mg/0.5 mg of Suboxone in the form of a sublingual film to be administered daily to Plaintiff at 5:00 a.m. for fourteen days, beginning on August 4, 2024. Def.'s JSMF ¶ 32.  This dose of buprenorphine was expected to be titrated in dosages increasing by 2.0 mg "up to a maintenance dose over several

weeks to months commensurate with regular follow-up evaluations to assess opioid cravings, which is the standard in the community." *Id.* ¶ 34 (emphasis omitted). From August 4–7, 2024, Plaintiff was administered Suboxone four times, once per day. *See id.* ¶ 35; Med. Admin. Rec., [ECF No. 90-13], at 1.

### III.  Plaintiff's Removal from the MAPS Program

On August 7, 2024, the Unit Manager of West Detention Center notified Defendant Sergeant Fairclough that Plaintiff had tested positive for Suboxone when it had not been prescribed to him. *See* Def.'s JSMF ¶ 37; Fairclough Aff., [ECF No. 90-2], ¶ 4. After investigating, Sergeant Fairclough issued an Inmate Disciplinary Report for Plaintiff's misuse of medication. *See* Inmate Disciplinary Rep., [ECF No. 90-2], at 4. According to the report, Plaintiff was asked why he tested positive for a controlled substance prior to receiving a prescription, to which Plaintiff responded, "That's my medication, it's prescribed to me." *Id.* But the report stated that Plaintiff tested positive for Suboxone <u>before</u> it was officially prescribed to him by medical staff. *See id.* It also indicated that Plaintiff's violation was not a minor infraction that could be resolved informally.[3] *See id.*

That same afternoon, Defendant Waits was contacted by Alison Perry, the Director of the Network, who informed Waits that Plaintiff was removed from the behavioral therapy component of the MAPS program due to Plaintiff's diversion of unprescribed Suboxone.[4] *See* Def.'s JSMF ¶¶ 41; 45. Waits discussed with Perry his belief that Plaintiff "was not receiving the full benefit of the buprenorphine-naloxone, was not [yet] receiving a maintenance dose [of 8.0 mg], and was

---

[3] Sheriff Ric L. Bradshaw had no personal contact with Plaintiff. *See* Def.'s JSMF ¶ 5.

[4] Waits did not direct Plaintiff's removal from the behavioral therapy component, which was not a medical decision. *See* Def.'s JSMF ¶ 45.

in initial induction when removed from the program." *Id.* ¶ 43.  Both Waits and Perry concluded that Plaintiff "could not have continuity of both medical and behavioral components for reasonable treatment of his opioid use disorder," so Waits discontinued Plaintiff's Suboxone prescription.  *Id.* ¶ 44.  Waits informed Plaintiff that he had been removed from the MAPS program and could reapply in thirty days.  *See id.* ¶ 46.

On August 16, 2023, Plaintiff met with Defendant Imtiaz Mohammed, ARNP and requested to be restarted on Suboxone.  *See id.* ¶ 49; Provider Progress Note, [ECF No. 90-16], at 2.  Mohammed reported that Plaintiff ambulated with a steady gait; was awake, alert, and oriented; and had regular cardiovascular and respiration rate, lungs clear to auscultation, warm and dry skin, no motor or sensory deficits, and no physical signs of withdrawals.  *See* Def.'s JSMF ¶ 50.  Mohammed thus denied Plaintiff's request for medication.  *Id.* ¶¶ 50–51.  The next day, Plaintiff was seen by medical staff, who observed that Plaintiff had been "vomiting" and had not eaten in three days, though all of Plaintiff's vital signs were "within normal range."  SAC, Ex. B, Progress Note, [ECF No. 53], at 34.[5]  Plaintiff asserts that Waits, at one point, observed Plaintiff "in the waiting room, shivering, and shaking in withdrawal symptoms."  SAC at 11.  Plaintiff avers that Waits "made eye contact" and "continued on with his day without ever addressing" his complaints.  *Id.*

On September 8, 2023, Plaintiff visited a psychiatrist, who noted that Plaintiff had reapplied to the MAPS program.  *See* Def.'s JSMF ¶ 52; Psychiatric Provider Progress, [ECF No. 90-17], at 1.

---

[5] The Court considers the Progress Note attached to Plaintiff's SAC as part of the record.  Additionally, as Plaintiff signed the SAC under penalty of perjury, his verified complaint may be treated as an affidavit for summary judgment purposes, provided that its assertions comport with Federal Rule of Civil Procedure 56(c)(4).  *See United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1444 n.35 (11th Cir. 1991).

IV.     **Plaintiff's Lawsuit**

When screening the SAC, the Court permitted Plaintiff to proceed on four claims of medical deliberate indifference against Defendants Waits, Fairclough, Bradshaw, and Mohammed in their individual and official capacities, as well as one claim against the PBSO for violation of Title II of the Americans with Disabilities Act.  *See generally* Order Screening SAC, [ECF No. 56].  Plaintiff alleges that, because of Defendants' constitutional and statutory violations, he suffered "devastating withdrawal symptoms, including . . . nausea, diarrhea, vomiting, fatigue, loss of appetite, insomnia, brief paralysis, aches and pain all over, loss of consciousness for an extended period of time, loss of weight, extreme depression, hot flashes, [and] cold sweats."  SAC at 18. Plaintiff demanded preliminary injunctive relief in the form of Defendants providing him with "the necessary medication to treat [his] diagnosed [opioid use disorder] for the duration of [his] time" in PBSO's correctional system,[6] as well as $500,000 in compensatory and punitive damages.  *Id.*

V.     **Disputed Facts**

Plaintiff and Defendants have several conflicting accounts regarding Plaintiff's medical treatment and relevant PBSO policy.  The disputed facts are summarized as follows:

Defendants assert that Plaintiff "was not assessed or placed on [S]uboxone treatment as part of continuity of care for any pre-detainment treatment."  Def.'s JSMF ¶ 2.  Plaintiff counters that he "participated in Suboxone treatment at a clinic prior to incarceration," Pl. SMF ¶ 2, and that Plaintiff had informed the staff of this pre-incarceration Suboxone treatment, his regular drug use, and his withdrawal symptoms, *see id.* ¶ 17.

Defendants state that Sheriff Bradshaw "had no subjective knowledge of or any knowledge whatsoever of Ferguson's medical needs, condition or treatment"; does not refuse medical care to

---

[6] The Court later denied Plaintiff's Motion for Preliminary Injunction.  *See generally* Order, [ECF No. 67].

inmates because they have a "disciplinary matter" or are "placed in disciplinary confinement"; and that Bradshaw's policies neither allowed any Wellpath employee to act deliberately indifferent to Plaintiff's needs, nor "restrict the delivery of medications, as determined by Wellpath, to inmates who are in segregated housing." Def.'s JSMF ¶¶ 5–7, 9; *see also* ¶ 63. Plaintiff disputes these assertions entirely, citing the SAC. *See* Pl.'s SMF ¶¶ 5–7, 9, 63. He counters that Bradshaw has authored a policy whereby "non-medical employees" make medical decisions with knowledge that such policy "would cause constitutional violations." SAC at 14–15.

Next, Defendants proffer that, when Plaintiff was assessed by Dr. Dack on February 8, 2023, Plaintiff was "cooperative" and "alert" and demonstrated, among other things, a "coherent thought process" and an "intact memory." Def.'s JSMF ¶ 19. Plaintiff disputes Dr. Dack's observations by reference to the SAC, in which he alleges that he "began to experience severe withdrawal symptoms" soon upon arrival at West Detention Center. SAC at 6.

Defendants further assert that Plaintiff admitted to Waits that he procured "buprenorphine from another inmate to help reduce his cravings." Def.'s JSMF ¶ 23 (emphasis added). Plaintiff clarifies that he "admitted to self-medicating by getting buprenorphine from another inmate to alleviate his withdrawal symptoms." Pl.'s SMF ¶ 23 (emphasis added).

Defendants claim that, during Plaintiff's appointment with Mohammed, he "did not meet any medical criteria to be restarted on [S]uboxone." Def.'s JSMF ¶ 51. But Plaintiff contends that he did satisfy the criteria to resume Suboxone treatment in alleging that he visited Mohammed "nine days into [his] withdrawals." SAC at 8.

Moreover, Defendants maintain that "Waits never refused to treat [Plaintiff] at any time, never ignored any complaints by [Plaintiff] and never punished him by not ordering any treatment or medication or by discontinuing medication." Def.'s JSMF ¶ 55. Defendants say the same

regarding Mohammed's interaction with Plaintiff. *See id.* ¶ 57. Plaintiff disputes both of these claims by way of the SAC (with no explanation), where he alleges that he was "denied the MAPS program all because [he] tested positive for the medication," SAC at 8, and that Mohammed deferred to Waits's decision, despite Plaintiff sharing that he "was in severe pain and suffering from withdrawals," *id.* at 9.

Defendants contend that Waits's "decision to discontinue the induction phase of the medication was based upon [his] sound medical judgment after consultation with [Perry]," namely that Plaintiff "would not be getting the full benefit from the overall MAPs program." Def.'s JSMF ¶ 58. Plaintiff disputes that the decision was based on a "sound medical judgment." Pl.'s SMF ¶ 58. Defendants also state that "[i]t was not medically necessary to maintain [Plaintiff] on the low dose of buprenorphine-naloxone as the discontinuance of 2 mg–0.5 mg dosage after four days would not provide a sufficient amount of the medication in [Plaintiff]'s system to produce withdrawal symptoms as he claims." Def.'s JSMF ¶ 47. Plaintiff disputes this by referencing the SAC (with no explanation), where Plaintiff recounts the rescission of his Suboxone prescription and alleges the development of withdrawal symptoms thereafter. *See* SAC at 7–9.

Defendants state that Sergeant Fairclough's involvement "consisted solely of issuing [Plaintiff] a disciplinary referral for the misuse of authorized medication and providing [Plaintiff] with a copy of the same." Def.'s JSMF ¶ 60. Plaintiff asserts, however, that Fairclough "took [him] off the medication as punishment." SAC at 14.

Defendants present the hypothetical that, if Plaintiff's providers believed that he "still required a [S]uboxone prescription after August 7, 2023," then Plaintiff would have been so prescribed "despite being removed from the MAPs program." Def.'s JSMF ¶ 70. Plaintiff disputes

this conjecture by reference to the SAC, in which Plaintiff recounts that several of his sick calls were ignored by medical staff.  *See* SAC at 10.

Lastly, the parties largely dispute whether Defendants' conduct caused or contributed to Plaintiff's alleged withdrawal symptoms.  *See* Def.'s JSMF ¶ 71; Pl.'s SMF ¶ 71.

## <u>LEGAL STANDARD</u>

Summary judgment shall be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no <u>genuine</u> issue as to any <u>material</u> fact, and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a), (c).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

In making this assessment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. v. Sun Life Ins. Co. of America*, 894 F.2d 1555, 1558 (11th Cir. 1990).  However, "there must be some question of fact before the district court can resolve that fact in the plaintiff's favor."  *Legg v. Wyeth*, 428 F.3d 1317, 1323 (11th Cir. 2005).  Moreover, the summary judgment standard "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–

48 (1986) (emphases added).  An issue of fact is material if it might affect the outcome of the case

under governing law.  *See id.* at 248.  "[T]he substantive law will identify which facts are material

. . . . Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  A dispute of fact

is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[A] verified complaint serves as the equivalent of an affidavit for purposes of summary

judgment."  *Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019) (citing *Baker v. Norman*, 651

F.2d 1107, 1115 (5th Cir. 1981)); *see also Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090,

1098 (11th Cir. 2014) ("We . . . credit the specific facts pled in [the plaintiff's] sworn complaint

when considering his opposition to summary judgment." (citations omitted)).  That being said,

"statements in affidavits that are based, in part, upon information and belief, cannot raise genuine

issues of fact" and "cannot be used to defeat a motion for summary judgment."  *Ellis v. England*,

432 F.3d 1321, 1326 (11th Cir. 2005).  The affidavit must satisfy Rule 56(c)(4), which requires

that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal

knowledge, sets out facts that would be admissible in evidence, and show that the affiant or

declarant is competent to testify on the matters stated."  FED. R. CIV. P. 56(c)(4).  Further, to the

extent sworn statements are "blatantly contradicted by the record, blatantly inconsistent, or

incredible as a matter of law," the statements may be discounted for summary judgment purposes.

*Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013).

If there are any factual issues, summary judgment must be denied, and the case proceeds

to trial.  *See Whelan v. Royal Caribbean Cruises Ltd.*, No. 12-22481, 2013 WL 5583970, at *2

(S.D. Fla. Aug. 14, 2013).  When the parties "agree on the basic facts, but disagree about the

inferences that should be drawn from these facts," summary judgment "may be inappropriate."  *Id.*

However, "[a] mere 'scintilla' of evidence" in support of the non-movant's position will not

suffice. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). Rather, "there must be enough

of a showing that the jury could reasonably find" for the non-moving party. *Id.*

## ANALYSIS

As previously explained, Plaintiff presents four claims of medical deliberate indifference

against Defendants Waits, Mohammed, Sergeant Fairclough, and Sheriff Bradshaw in their

individual and official capacities, and one claim against the PBSO for violation of Title II of the

Americans with Disabilities Act ("ADA"). The Court addresses Plaintiff's claims in turn and, for

the reasons below, finds that none of them survive summary judgment.

### I.    Plaintiff's Deliberate Indifference Claims

The Eighth Amendment's Cruel and Unusual Punishments Clause prohibits "deliberate

indifference to a prisoner's serious illness or injury."[7] *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).

The controlling precedent in this circuit is *Wade v. McDade*, 106 F.4th 1251 (11th Cir. 2024).

Relying on *Farmer v. Brennan*, 511 U.S. 825 (1994), the Eleventh Circuit clarified that the correct

test is the "criminal recklessness" standard first adopted in *Farmer*. *Wade*, 106 F.4th at 1257.

Such a standard, the Court explained, "ensure[s] that only inflictions of punishment carry liability"

by requiring "the plaintiff inmate to prove that the defendant prison official <u>actually knew</u> of a

substantial risk of serious harm" to the inmate, and "not just that he <u>should have known</u>." *Id.* The

Court laid out a two-step analysis:

> <u>First</u>, of course, the plaintiff must demonstrate, as a threshold matter, that he
> suffered a deprivation that was, "objectively, 'sufficiently serious.'" [*Farmer*, 511
> U.S.] at 834 (citation omitted). <u>Second</u>, the plaintiff must demonstrate that the

---

[7]  Since Plaintiff is a pretrial detainee, his claims arise under the Fourteenth Amendment. *See Taylor v. Adams*, 221 F.3d 1254, 1257 n.3 (11th Cir. 2000) (stating that a pretrial detainee's "Cruel and Unusual Punishment claims sound properly in the Fourteenth Amendment right to due process of law rather than in the Eighth Amendment," both of which are analyzed identically).

> defendant acted with "subjective recklessness as used in the criminal law," *id.* at 839, and to do so[,] he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff—with the caveat, again, that even if the defendant "actually knew of a substantial risk to inmate health or safety," he "cannot be found liable under the Cruel and Unusual Punishments Clause" if he "responded reasonably to the risk." *Id.* at 844–45.

*Id.* at 1262.

The Court elaborated that "criminal recklessness" is marked by an official's "subjective awareness of the risk posed by his own conduct rather than . . . on some allegedly preexisting risk." *Id.* (emphasis added); *see also id.* at 1261 (relying on a criminal-law treatise explaining that "recklessness in causing a result exists when one is aware that his conduct might cause the result, though it is not substantially certain to happen" (internal quotation marks omitted; emphasis in original; quoting WAYNE LAFAVE, SUBSTANTIVE CRIMINAL LAW § 5.4(f), at 507 (2018)); recognizing that "a person acts recklessly . . . when he consciously disregards a substantial and unjustifiable risk attached to his conduct" (quotation marks omitted; emphasis in original; quoting *Borden v. United States*, 593 U.S. 420, 427 (2021))).

Although the *Wade* panel drew distinctions between 'action' and 'inaction'-based cases, the Court noted that the deliberate indifference standard "applies similarly in both kinds of cases." *Id.* at 1260.  The Court explained that in cases where a prison official takes an action, "the reviewing court must assess the defendant's [subjective] knowledge by reference to the risk created by his own conduct."  *Id.* (emphasis in original).  The same assessment is required where an inmate's substantial risk of harm "result[s] from something a prison official . . . doesn't do," rather than a "preexisting risk that the inmate plaintiff faced."  *Id.* (emphases added).

The *Wade* opinion unambiguously articulated the criminal recklessness standard. Much doubt remained, however, regarding its application and the effect of *Wade* on prior precedent. United States Circuit Judge Adalberto Jordan shared his wisdom on the issue:

> My suggestion, for whatever it might be worth, is that courts and attorneys look carefully at prior Eleventh Circuit cases to see if they are consistent with the subjective component of deliberate indifference set out in *Farmer*. If they are consistent, then they should continue to be cited as binding precedent. If they are not, then they probably have been abrogated to at least some degree by today's decision.

*Id.* at 1265 (Jordan, J., concurring).

Aside from *Wade*'s objective and subjective prongs, "a plaintiff must show causation between the [defendant's] deliberate indifference and his injury." *Ravon v. Talton*, No. 21-11036, 2023 WL 2238853, at *7 (11th Cir. Feb. 27, 2023) (citation omitted); *see also McDowell v. Brown*, 392 F.3d 1283, 1292 (11th Cir. 2004) (recognizing that a plaintiff alleging deliberate indifference must show that the defendant's "deliberate conduct" was the "moving force" behind his injury to prove causation).

With the foregoing elements in mind, the Court pivots to Plaintiff's deliberate indifference claims against each of the Defendants.

### A. Prong One: Plaintiff Has Shown an Objectively Serious Medical Need

As a threshold matter, the record demonstrates that Plaintiff had an objectively serious medical need. Federal courts around the country have held that opioid use disorder, including the side effects of forced withdrawal from opioid use, is a serious medical need. *See Foelker v. Outagamie Cnty.*, 394 F.3d 510, 512–13 (7th Cir. 2005) (holding that "forced withdrawal from methadone" constituted a "serious medical need"); *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1039 (10th Cir. 2020) (Bacharach, J., concurring in part and dissenting in part)

("Just as withdrawal from alcohol can constitute a serious medical need when the symptoms are severe, so too can withdrawal from opiates like heroin.").

Here, Defendants do not hide that Plaintiff met the criteria for opioid use disorder. Importantly, Waits personally diagnosed Plaintiff's condition as <u>severe</u>.  While Defendants posit that "there is no objective evidence that Plaintiff was experiencing withdrawal symptoms at any material time," this speaks more to Defendants' lack of awareness of Plaintiff's withdrawal risk rather than the serious nature of Plaintiff's diagnosis.  Mot. at 6–7.  After all, "a serious medical need is an injury or condition that a physician has diagnosed as requiring treatment."  *Hinson v. Bias*, 927 F.3d 1103, 1121–22 (11th Cir. 2019).  That's precisely what happened here.  Waits believed that Plaintiff's condition warranted a Suboxone prescription and Plaintiff's participation in the MAPS program.  Accordingly, while not enough to save his constitutional claims, Plaintiff has satisfied the first prong of deliberate indifference.

### B.  Prong Two: Plaintiff Has Not Shown Defendants' Criminal Recklessness

At this juncture, *Wade*'s deliberate indifference test leaves Plaintiff with no path forward. After reviewing the undisputed factual record and considering Defendants' arguments, the Court concludes that no genuine dispute of material fact exists that Defendants were not "actually, subjectively aware that [their] own conduct caused a substantial risk of serious harm to" Plaintiff. *Wade*, 106 F.4th at 1262.

### 1.  Ronald Waits, ARNP

Beginning with Defendant Waits, he presents three arguments in favor of summary judgment.  To start, Waits insists that his "decision to discontinue the induction phase of [Plaintiff's] medication was based on his sound medical judgment" that Plaintiff would neither benefit from the medication nor develop withdrawal symptoms without it.  Mot. at 11.  Next, Waits

draws support from a nationwide collection of caselaw to argue that a "defendant's discontinuation of Suboxone as part of an inmate or detainee's removal from a correctional facility's [medication-assisted therapy] program d[oes] not constitute deliberate indifference." *Id.* at 14.  Lastly, Waits maintains that he did not know Plaintiff "was in risk of serious harm if [he] did not immediately restart Plaintiff" on Suboxone because "there [was] no evidence in the medical record that [Waits] observed signs of severe withdrawal symptoms." *Id.* at 11–12 (cleaned up).

Waits is entitled to summary judgment because Plaintiff has failed to proffer <u>any</u> evidence that Waits observed signs of Plaintiff's withdrawals, or otherwise "actually, subjectively" knew of Plaintiff's withdrawal risk, when Waits treated him. *Wade*, 106 F.4th at 1262.[8]  In any event, Plaintiff's claim against Waits sounds in medical malpractice and thus cannot establish deliberate indifference.

To begin, *Farmer* demands that Waits "must <u>both</u> be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, <u>and</u> he must also draw the inference." *Farmer*, 511 U.S. at 837 (emphases added).  Waits's "subjective awareness" of Plaintiff's risk is not defined by Plaintiff's "allegedly preexisting risk," but by "the risk posed by [Waits's] <u>own conduct</u>." *Wade*, 106 F.4th at 1262 (emphasis added).  So, to overcome summary judgment, Plaintiff must show a genuine dispute of material fact that Waits subjectively appreciated that his conduct could result in Plaintiff's development of withdrawal symptoms.

---

[8] As a preliminary matter, Plaintiff contends that "[t]here is a genuine issue of material fact as to whether [Plaintiff] was denied [his] medication because he was taken out of the program [or] because of his disciplinary report." Resp. at 3.  If Plaintiff means to say that a dispute exists as to whether Waits rescinded Plaintiff's medication for <u>penological</u> purposes, that is a dispute of law rather than fact.  Indeed, the deliberate-indifference test set out in *Wade* is designed to identify reckless inflictions of punishment, and Plaintiff cannot bypass the application of that test.  For the reasons provided in this Order, Plaintiff falls short of satisfying that test here.

As explained below, the evidence, including Plaintiff's sworn testimony—even when viewed in the light most favorable to him—does not satisfy this standard.  This is principally because Waits never observed Plaintiff's withdrawal symptoms, or knew of Plaintiff's history of withdrawals, when he first medically assessed him.  Consequently, Waits never "actually, subjectively" knew that Plaintiff had an individual propensity to develop withdrawal symptoms without access to Suboxone.  *Id.*  For that matter, Waits could not have drawn the inference of a substantial risk of serious harm "posed by his own conduct" when he later rescinded Plaintiff's Suboxone.  *Id.*

To be clear, Waits personally knew that Plaintiff's opioid use disorder was severe and under a fair degree of control.  And the Court is not only sensitive to the severity of Plaintiff's condition, but to the utility of his prescription in treatment thereof.  Along this vein, Plaintiff asserts that Waits "should have known" that Plaintiff could have developed withdrawals.  *See* Resp. at 4 ("And a jury could also conclude that the Defendants knew (or at least should have known) that taking Plaintiff—an opiate addict—off his medication and out of the [MAPS] program could cause a substantial risk of serious harm[.]").  But these considerations are not enough to infer Waits's knowledge of Plaintiff's withdrawal risk.  For starters, it is axiomatic that Waits cannot be held liable for his "failure to alleviate a significant risk that he <u>should</u> have perceived but did not." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) (emphasis added); *see also Wade*, 106 F.4th at 1257 (recognizing that "*Farmer* adopted a criminal-recklessness standard, which requires the plaintiff inmate to prove that the defendant prison official <u>actually knew</u> of a substantial risk of serious harm, not just that he <u>should have known</u>." (emphases in original)); *cf. Estate of Owens v. Geo Group, Inc.*, 660 F. App'x 763, 768 (11th Cir. 2016) (recognizing that "[a]ctual knowledge

of the substantial risk is required for one to deliberately disregard it; constructive knowledge of the risk is insufficient to establish deliberate indifference under the Eighth Amendment").

Consistent with this principle, circuit courts have not inferred a provider's knowledge of a plaintiff's withdrawal risk purely from his use (or prior use) of opiate medication, absent other evidence showing the provider's specific awareness of the plaintiff's risk of withdrawals. *Cf. Jones v. Dr. Steve Anderson Behav. Med., LLC*, 767 F. App'x 701, 701–05 (11th Cir. 2019) (finding that a nurse "was not subjectively aware that [an inmate] was at substantial risk of developing drug withdrawal syndrome" where the inmate reported her prescription for Subutex— a drug used to treat opioid addition—but exhibited no symptoms of acute distress or substance abuse, and the nurse chose not to prescribe Subutex, "unaware that discontinuing Subutex could cause drug withdrawal syndrome"); *Toguchi v. Chung*, 391 F.3d 1051, 1059 (9th Cir. 2004) (finding plaintiff's contention that he had taken Klonopin for nineteen years but "had not taken Klonopin during the last five or six months before his parole," and, according to his doctor, "had been totally stable with Trilafon, Depakote, BuSpar, and Cogentin," supported the conclusion that "Dr. Chung . . . followed a course of treatment that she considered effective," and there was "absolutely no indication . . . that Dr. Chung was aware of a risk that [plaintiff] was suffering from Klonopin withdrawal," so there could be "no liability under the Eighth Amendment" (cleaned up)); *Bruederle v. Louisville Metro Gov't*, 687 F.3d 771, 778 (6th Cir. 2012) ("Smith recognized that Bruederle presented at least some risk of withdrawal symptoms . . . because of the medications he was taking.  But it was within reasonable medical judgment to conclude Bruederle did not pose a withdrawal risk . . . given his lack of a seizure history and the absence of withdrawal symptoms.").

The Court further considers that Plaintiff explicitly told Waits about his history of withdrawals.[9]  On this point, Plaintiff contends that Waits's rescission of his Suboxone was "factually premised on not believing Plaintiff when he said he was experiencing withdrawal symptoms."  Resp. at 5.  Perhaps, but perhaps not.  As a general matter, an inmate's verbal self-reporting cannot establish subjective knowledge on its own because "[a]n inmate might claim to have prescriptions for narcotic drugs in an effort to get those drugs from a nurse."  *Whyde v. Sigsworth*, No. 22-3581, 2024 WL 4719649, at *3 (6th Cir. Nov. 8, 2024).  And when an inmate discloses "that he's in pain, that 'might not be enough to infer that [a nurse] actually knew he was in pain—she could have thought, for example, that [the inmate] was misrepresenting his pain in order to get access to pain medications.'"  *Id.*  (quoting *Jackson v. Gibson*, 779 F. App'x 343, 348 (6th Cir. 2019)).

Moreover, giving weight to Plaintiff's self-report becomes doubly problematic when—viewing the record and Plaintiff's sworn testimony in the light most favorable to him—nothing shows that Waits knew how long Plaintiff had diverted Suboxone, how much he had self-administered Suboxone prior to their appointment, and when (or whether) Plaintiff had ever developed withdrawal symptoms in the past.[10]  Plaintiff thus provided no details from which Waits could actually draw the inference of Plaintiff's withdrawal risk during their appointment.  *See*

---

[9]  It is another question entirely whether Plaintiff's sworn allegations support any reasonable inference that he told Waits about past withdrawals.  Those relevant allegations are: "[Waits and I] discussed how I had been self-medicating to avoid the devastating withdrawal symptoms in any way possible."  SAC ¶ 14 (cleaned up).  Nevertheless, the Court will assume a reasonable juror could infer from Plaintiff's sworn assertion that he personally told Waits that he had previously suffered withdrawal symptoms.

[10]  Plaintiff insists that, before he met with Waits, he informed medical staff of his developing withdrawal symptoms.  *See* Pl.'s SMF ¶ 17 (citing SAC at 6).  But, except for Perry, there is no evidence that any member of Wellpath's staff knew, or accessed, this medical history.

*Farmer*, 511 U.S. at 837 (stating that "the official must both be aware that a substantial risk of serious harm exists, and he must also draw the inference").

Even considering all the evidence in its totality, the Court still cannot conclude that Plaintiff's withdrawal risk was somehow obvious to Waits.  True, "circumstantial evidence of the obviousness of the risk can create an issue of fact . . . in the plaintiff's favor."  *Wade*, 106 F.4th at 1264 (Jordan, J., concurring).  But, for a substantial risk to be considered obvious, the *Farmer* Court strongly suggested that the risk must be "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and the circumstances should demonstrate that the defendant "had been exposed to information concerning the risk and thus must have known about it."  *Farmer*, 511 U.S. at 842 (internal quotations omitted).

Here, despite Plaintiff's self-report and his conclusory assertion that his medical history was documented, "there is no indication in the record that any outside physician . . . informed the [j]ail medical staff that Plaintiff . . . had a serious medical need for [Suboxone] during the time period at issue[,]" such that withdrawal symptoms would occur if Plaintiff was deprived of the medication.  *Chatham v. Adcock*, 334 F. App'x 281, 289 (11th Cir. 2009) (cleaned up).  And assuming Plaintiff, in fact, told staff of his previous buprenorphine treatment, Plaintiff had not been on any opiate treatment plan at a PBSO facility before meeting with Waits, and he has failed to allege or proffer anything showing that Waits "must have known" about any past treatment.  *Farmer*, 511 U.S. at 842 (internal quotations omitted).  Therefore, absent knowledge of the possibility of withdrawals, Plaintiff cannot show that Waits had "knowledge of the need for medical care and . . . intentional[ly] refus[ed] to provide that care."  *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995) (citations omitted).

In any event, the Court invokes the deliberate indifference "caveat"—that is, the evidence does not establish that Waits acted so unreasonably as to support an inference of deliberate indifference. *Wade*, 106 F.4th at 1262. Ordinarily, when "[t]he record . . . contains disputes and differing inferences" about whether a medical professional "failed to provide treatment during a period in which [he] had an obligation to render care[,]" summary judgment should be denied. *Rogers v. Evans*, 792 F.2d 1052, 1061 (11th Cir. 1986). But in the context of a deliberate indifference claim under the Eighth Amendment, a denial of summary judgment is unwarranted where a plaintiff's claim merely sounds in medical malpractice. *See Adams*, 61 F.3d at 1545. In these cases, "matters of medical judgment do not constitute deliberate indifference." *Wilson v. Smith*, 567 F. App'x 676, 678 (11th Cir. 2014) (citing *Estelle*, 429 U.S. at 107).

Waits determined that Plaintiff could not have continuity of medication-assisted therapy for "reasonable treatment" of his opioid disorder after he was removed from the behavioral therapy component of the MAPS program. Mot. at 10. He also determined that discontinuance of Plaintiff's low dose of Suboxone after four days would not have produced withdrawal symptoms. *See id.* Plaintiff disputes whether Waits's decision was "sound" by merely referencing his later development of withdrawals, but he proffers no evidence showing that Waits's decision was such a gross deviation from the acceptable standards of medical care that a jury could reasonably infer deliberate indifference. *See Adams*, 61 F.3d at 1543; *Witt v. Stryker Corp. of Michigan*, 648 F. App'x 867, 874 (11th Cir. 2016) ("The nonmoving party must show <u>specific facts</u> to support that there is a genuine dispute." (citing *Anderson*, 477 U.S. at 256) (emphasis added)). Plaintiff's failure thus precludes the inference that Waits's conduct was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers*, 792 F.2d at 1058.

Certainly, it is not lost on the Court that Waits's decision did not represent the beacon of medical standards.  However, since Plaintiff's claim sounds merely in malpractice, it is insufficient to establish deliberate indifference.  *See Brennan v. Thomas*, 780 F. App'x 813, 821 (11th Cir. 2019); *Bruederle*, 687 F.3d at 778 ("At best, Bruederle might argue that Smith should have known he would suffer a seizure or should have taken more aggressive precautionary steps, but that is the language of medical malpractice, not deliberate indifference."  (citation omitted)).

To summarize, no reasonable juror could find that Waits actually knew "that [Plaintiff] was at risk of [withdrawals] if he did not receive medical treatment, but unreasonably—and at least recklessly—delayed, failed to provide, or refused to provide medical treatment."  *Brennan*, 780 F. App'x at 821 (citation omitted).  One can speculate endlessly what Waits should have assumed regarding Plaintiff's withdrawal risk, but the Court is in no position to substitute its own intuition for the findings of a medical professional.  And, while sympathetic to Plaintiff's position, the Court cannot "allow the advantage of hindsight to determine whether conditions of confinement amounted to cruel and unusual punishment."  *Purcell ex rel. Estate of Morgan v. Toombs Cnty.*, 400 F.3d 1313, 1320 (11th Cir. 2005).  The Court therefore grants summary judgment as to Defendant Waits.[11]

---

[11]  Plaintiff's claim that Waits later ignored his withdrawal symptoms falls woefully short of overcoming summary judgment.  Plaintiff merely alleges that Waits ignored his sick calls, and as Plaintiff "waited in the waiting room, shivering and shaking in withdrawal symptoms," Waits looked at him "through the glass," "made eye contact," and "continued on with his day without ever addressing my complaints."  SAC ¶¶ 32–33.  As a threshold matter, these allegations fall outside the scope of the Court's initial screening order pursuant to 28 U.S.C. § 1915A, in which the Court concluded that Plaintiff stated a claim against Waits only by averring that he was "deliberately indifferent to my serious medical needs by taking me off my medication that he himself prescribed as a punishment while the medical needs still exist."  Order Screening Compl., [ECF No. 4], at 7; *see also* Order Screening SAC, [ECF No. 56].  In any event, Plaintiff's allegations cannot establish deliberate indifference.  No reasonable jury could infer from the evidence—testimonial or otherwise—that Waits subjectively appreciated Plaintiff's medical needs from his sick calls, or that Waits knew that Plaintiff's symptoms in the waiting room amounted to dangerous withdrawals that, if left untreated, would cause serious harm.  Put differently, Plaintiff's sworn statements fail to create any genuine dispute that Waits refused to treat Plaintiff in violation of his Fourteenth Amendment rights.

### 2. *Imtiaz Mohammed, ARNP*

Moving on to Defendant Mohammed, the Court finds that here, too, summary judgment is warranted.  Plaintiff's sworn assertions provide that he told Mohammed he was in "severe pain and suffering from withdrawals" and had been "vomiting, experiencing bad diarrhea, fever, and the shakes." SAC ¶ 25.  His self-report aside, Plaintiff does <u>not</u> dispute that when Mohammed assessed him, he was reportedly awake, alert, and had a regular cardiovascular and respiration rate; a steady gait; lungs clear to auscultation; warm and dry skin; no motor or sensory deficits; and no noted physical signs of withdrawals.  In other words, Plaintiff does not meaningfully dispute that he manifested to Mohammed no obvious signs of opiate withdrawal.  Moreover, Plaintiff had not been taking Suboxone at the time and "did not appear to be in acute distress." *Jones*, 767 F. App'x at 704.  Thus, on this record, there is no genuine dispute that Mohammed "was not subjectively aware that [Plaintiff] was at substantial risk of developing drug withdrawal syndrome" without a renewed Suboxone prescription.  *Id.*  Plaintiff's self-report, without more, is again insufficient to hold otherwise.  *Cf. Harrison v. Chez*, No. 92-3382, 1994 WL 705103, at *1 (7th Cir. Dec. 14, 1994) ("Being aware that a prisoner <u>reports</u> pain is some distance from being aware of a substantial risk of harm; many reports are false, . . . and most true reports of pain do not imply a substantial risk of harm from delay." (emphasis in original)); *Farmer*, 511 U.S. at 840 ("Eighth Amendment liability requires <u>consciousness</u> of a risk." (emphasis added)).

That said, Plaintiff alleges that Mohammed knew that Waits had previously diagnosed Plaintiff's opioid use disorder, and that Mohammed even casually opined that Waits erred in rescinding Plaintiff's Suboxone.  *See* SAC ¶¶ 22–23.  Yet, upon observing no present risk of serious harm to Plaintiff, Mohammed had no constitutional obligation to replicate Waits's original treatment plan. *See Collins v. Ferrell*, No. 21-14027, 2024 WL 4677418, at *6 (11th Cir. Nov. 5,

2024) ("Although Collins preferred Dr. Winchell's recommendations, the Eighth Amendment does not require Dr. Ferrell to abandon his own medical judgment in favor of that of another doctor's." (internal citations omitted)); *see also Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) (noting that "a simple difference in medical opinion" does not constitute deliberate indifference)); *Bismark v. Fisher*, 213 F. App'x 892, 897 (11th Cir. 2007) ("The Eighth Amendment did not compel Dr. Fisher to check his own medical training and judgment at the door, simply because he was informed that some other doctor at some other time had prescribed orthopedic shoes for his patient.").

Since there is no genuine dispute of material fact that Mohammed did not act deliberately indifferent to Plaintiff's medical needs, summary judgment is appropriate.

### 3. Sergeant Honray Fairclough

The Court also grants summary judgment as to Sergeant Fairclough. Fairclough principally argues that he "had no contact with the Plaintiff and had no subjective knowledge of . . . Plaintiff's medical needs." Mot. at 7. Fairclough emphasizes that he played no role in the rescission of Plaintiff's medication, because Plaintiff—despite his violation—"was eligible to receive Suboxone if medically needed, regardless of whether he was admitted to the MAPS program or not." *Id.* at 8.

As illustrated twice now, the Court must assess Fairclough's knowledge "by reference to the risk created by his own conduct." *Wade*, 106 F.4th at 1260; *see also Burnette*, 533 F.3d at 1331 (explaining that "[e]ach individual Defendant must be judged separately and on the basis of what that person" knew at the time of the incident). While Fairclough's disciplinary referral potentially played some role in Plaintiff's removal from the MAPS program's behavioral therapy component, the Court finds that Fairclough is not liable for the deprivation at issue—namely,

pausing Plaintiff's Suboxone administrations.  Fairclough admits he had personal knowledge that Plaintiff tested positive for Suboxone, and Fairclough also knew that Plaintiff was prescribed Suboxone by a Wellpath provider.  But the parties agree that Fairclough never directed a Wellpath provider to rescind Plaintiff's Suboxone, never prevented Plaintiff from obtaining a Suboxone prescription, and that Fairclough lacked any knowledge of Plaintiff's medical needs or opioid disorder.[12]  Viewed in the light most favorable to Plaintiff, the record lacks any indication that Fairclough possessed subjective knowledge of Plaintiff's propensity to develop withdrawal symptoms without Suboxone treatment.

Thus, being that Fairclough had no knowledge of Plaintiff's withdrawal risk, any inference that Fairclough was "aware that his conduct"—issuing Plaintiff's disciplinary referral—"might cause" Plaintiff harm is foreclosed by the record.  *Wade*, 106 F.4th at 1261.  Further, there is no dispute that Defendant Fairclough lacked "any medical training and medical personnel made all decisions concerning . . . [Plaintiff]'s course of treatment."  *Kelly v. Ambroski*, 97 F. Supp. 3d 1320, 1343 (N.D. Ala. 2015).  And it is well settled that "supervisory officials are entitled to rely on medical judgments by medical professionals responsible for prisoner care."  *Williams v. Limestone Cnty.*, 198 F. App'x 893, 897 (11th Cir. 2006).  Therefore, "[i]n the absence of a reason to believe, or actual knowledge, that medical staff [was] administering inadequate medical care, [Fairclough is] not chargeable with the Eighth Amendment scienter requirement of deliberate indifference."  *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).

---

[12]  Recall, however, that Plaintiff does dispute that Fairclough's involvement consisted solely of issuing Plaintiff a disciplinary referral and providing him with a copy.  In support thereof, Plaintiff cites his sworn allegation that Fairclough "took [him] off the medication as punishment."  SAC at 14.  That Fairclough himself, rather than Waits, rescinded Plaintiff's Suboxone prescription is not genuinely in dispute; rather, it is a bare assertion that is "so utterly discredited by the record that no reasonable jury could have believed him."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

In sum, there is no genuine dispute of material fact that Fairclough was not "actually aware that his own conduct caused a substantial risk of serious harm to [] Plaintiff," *Wade*, 106 F.4th at 1261. Accordingly, summary judgment is entered in favor of Sergeant Fairclough.

### *4. Sheriff Ric Bradshaw*

The Court now proceeds to Defendant Sheriff Bradshaw and the first of Plaintiff's policy-based deliberate indifference claims. A sheriff may not be held liable under 42 U.S.C. § 1983 unless he "personally participates in the alleged constitutional violation or . . . there is a causal connection between actions of the supervising official and the alleged constitutional violation." *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013). Supervisory liability imposes an extremely rigorous standard. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1308 (11th Cir. 209).

Generally, a sheriff's supervisory liability under § 1983 can occur in one of three ways: (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," (2) the supervisor has a "custom or policy" which "results in deliberate indifference to [the plaintiff's] constitutional rights," or (3) the supervisor failed "to adequately train [his] officers"—which is a <u>de facto</u> policy that "giv[es] rise to governmental liability." *Christmas v. Harris Cnty., Ga.*, 51 F.4th 1348, 1355 (11th Cir. 2022) (cleaned up).

At the outset, there is no genuine dispute of material fact that Sheriff Bradshaw never personally participated in Plaintiff's alleged deprivation. Plaintiff agrees that Sheriff Bradshaw had no contact with him. And nothing in the record—including Plaintiff's sworn allegations—could support any reasonable inference that Sheriff Bradshaw subjectively knew and recklessly disregarded Plaintiff's medical needs.

Moreover, it is well established that "[t]here can be no . . . supervisory liability when there is no underlying constitutional violation." *Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 821 (11th Cir. 2017); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized [unconstitutional conduct] is quite beside the point."). Here, because the Court has concluded that Plaintiff did not suffer a constitutional deprivation at the hands of Defendants, the Court need not inquire whether Sheriff Bradshaw was aware of any "widespread abuse" or an unconstitutional "custom or policy." *Christmas*, 51 F.4th at 1355. Therefore, the Court grants summary judgment as to Defendant Sheriff Bradshaw.

### 5. PBSO

Plaintiff's deliberate indifference claim against the PBSO stems from his official-capacity suits against all individual Defendants. "[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent[.]" *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691 n.55 (1978). "Such suits against municipal officers are therefore, in actuality, suits directly against the [municipality] that the officer represents." *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (citing cases).

"A municipality may be held liable under [42 U.S.C.] § 1983 if the plaintiff shows that a 'custom' or 'policy' of the municipality was the 'moving force' behind the constitutional deprivation." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (quoting *Monell*, 436 U.S. at 690–94). "A plaintiff . . . has two methods by which to establish a county's policy: identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329–30 (11th Cir. 2003).

However, for two reasons, the Court need not address Plaintiff's official-capacity claims. <u>First</u>, under Florida law, the PBSO is not a "legal entit[y] subject to suit" under § 1983. *Dean v. Barber*, 951 F.2d 1210, 1214 (11th Cir. 1992). Rather, Sheriff Bradshaw "is the only official who oversees the daily operation of the jails and the supervision of inmates" and therefore, is the only party who's responsible "for the [j]ail's allegedly unconstitutional policies or customs." *Burgess v. Palm Beach Cnty.*, No. 23-81265, 2023 WL 7410056, at *2 (S.D. Fla. Nov. 9, 2023) (cleaned up). <u>Second</u>, and in any event, it is futile to consider whether a municipal policy caused Plaintiff's alleged deprivation where no constitutional violation has occurred. *See Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996). Accordingly, summary judgment is entered in favor of the PBSO as to Plaintiff's medical deliberate indifference claim.

### C. Defendants Benefit from Qualified Immunity

Because Defendants further assert that they are shielded by qualified immunity, Plaintiff bears the burden of rebutting its applicability. But Plaintiff has not opposed this defense whatsoever, and the underlying evidence otherwise fails to show that Defendants were not acting within the scope of their discretionary authority. Thus, for the following reasons, Defendants enjoy qualified immunity and are entitled to summary judgment on this alternative basis.

"Qualified immunity shields government employees from suit in their individual capacities for discretionary actions they perform while going about their duties." *Brooks v. Miller*, 78 F.4th 1267, 1279 (11th Cir. 2023). "The thought behind the doctrine is the 'balancing of two important public interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Id.* (quoting *Davis v. Waller*, 44 F.4th 1305, 1312 (11th Cir. 2022)). "Under the balance that qualified immunity strikes, 'all but the plainly incompetent or

those who knowingly violate the law' enjoy its protection.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"To determine whether qualified immunity applies, [courts] engage in a burden-shifting analysis." *Id.* at 1280. The first step requires a defendant to show that he was acting within the scope of his discretionary authority when committing the challenged act. *Id.* (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). "[A] government official can prove he acted within the scope of his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988) (citation omitted). "Once the defendant does that, the burden shifts to the plaintiff, who must show that qualified immunity is not appropriate." *Brooks*, 78 F.4th at 1279.

Here, the Defendants argue that Bradshaw and Fairclough "were acting within their discretionary authority as correctional officers," and Waits and Mohammed "were acting within their discretionary authority as medical providers who provided care and treatment to detainees at the facility pursuant to their employer's agreement with PBSO." Mot. at 19. The Court agrees. Both Waits and Mohammed's conduct was clearly "of a type that fell within [their] job's responsibilities" as medical providers. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). And "inmate discipline and control is a primary job responsibility for" officials like Fairclough and Bradshaw, and such actions are "well within the scope of their discretionary authority." *McNeeley v. Wilson*, 649 F. App'x 717, 721 (11th Cir. 2016).

Since Plaintiff "never disputed [that Defendants] were acting under their discretionary authority . . . the burden [is] on him to demonstrate [that Defendants] violated his clearly established rights." *Maldonado v. Unnamed Defendant*, 648 F. App'x 939, 955 (11th Cir. 2016).

But Plaintiff has not responded to this defense at all, thereby waiving any opposition to it. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."). Mindful of the need to decide summary judgment motions on their merits, however, the Court concludes that Defendants are nevertheless entitled to qualified immunity.

To show that qualified immunity is not appropriate requires "the plaintiff to satisfy two prongs: (1) . . . that the defendants violated his constitutional rights, and (2) . . . that, 'at the time of the violation, those rights were 'clearly established . . . in light of the specific context of the case, not as a broad general proposition.'" *Stalley v. Cumbie*, 124 F.4th 1273, 1284 (11th Cir. 2024) (quoting *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017)). "Courts have discretion to decide the order in which to engage these two [qualified immunity] prongs." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citing *Pearson v. Callahan,* 555 U.S. 223, 236, 129 (2009)). Under either prong, however, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* (citing *Brosseau v. Haugen,* 543 U.S. 194, 195 n.2 (2004) (per curiam)). The Supreme Court has cautioned that "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Kisela v. Hughes*, 584 U.S. 100, 105 (2018) (citing *Plumhoff v. Rickard*, 572 U.S. 765, 778–779 (2014)).

Plaintiff has not met his burden of satisfying the first prong—that Defendants violated his constitutional rights—for the reasons already stated by the Court. Viewing the record in the light

most favorable to Plaintiff, the Court concludes that none of the Defendants were subjectively aware of Plaintiff's withdrawal risk before the alleged deprivations occurred.  *See, e.g.*, *Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he <u>should</u> have perceived but <u>did not</u>, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." (emphases added)); *see also Hope v. Pelzer*, 536 U.S. 730, 738 (2002). "Having found no constitutional violation," the Court would ordinarily "not reach the clearly established prong of the qualified immunity analysis." *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1274 (11th Cir. 2008).  And as to Defendants Mohammed, Fairclough, and Bradshaw, the Court's inquiry stops here.

As to Defendant Waits, the Court will momentarily reaffirm why the record, and Plaintiff's failure to appreciate his high burden, commands finding that Waits enjoys qualified immunity. The Eleventh Circuit has stated that for a medical provider to be stripped of qualified immunity, a plaintiff must demonstrate that the provider's actions "violated a clear and specific standard and that similarly situated reasonable health care providers would have known that their actions violated [the plaintiff]'s constitutional right." *Adams*, 61 F.3d at 1543 (citation omitted).  "In a medical treatment case, a plaintiff may demonstrate the existence of a clearly established medical standard either through reference to prior court decisions or to the contemporary standards and opinions of the medical profession." *Id.* (citation omitted).

But "if an official's actions required medical judgments, a plaintiff may need to do more than refer to prior cases." *Howell v. Evans*, 922 F.2d 712, 720 (11th Cir. 1991), *vacated*, 931 F.2d 711 (11th Cir. 1991), *opinion reinstated sub nom. Howell v. Burden*, 12 F.3d 190 (11th Cir. 1994). In these instances, a plaintiff must show "that a reasonable doctor in the defendant's position would have known that his actions were grossly incompetent by medical standards" to prove deliberate

indifference and overcome qualified immunity.  *Id.* at 721; *see also Waldrop*, 871 F.2d at 1034 ("The question is not whether deliberate indifference to an inmate's [medical] needs would violate the inmate's Eighth Amendment rights. . . . The question is whether a reasonable doctor in the same circumstances and possessing the same knowledge as [the defendant] could have concluded that his actions were lawful[.]" (citations omitted)).  "This latter method of proof often is essential when a doctor's actions are at issue, because the evaluation of medical care is frequently fact-specific and dependent on medical knowledge." *Howell*, 922 F.2d at 721.

Plaintiff has wholly bypassed this step, which is fatal to his case.  Defendant Waits—vested with no <u>actual</u>, subjective knowledge of Plaintiff's history of withdrawals or how much (or how long) Plaintiff had previously taken Suboxone—medically determined that ceasing Suboxone after four, low-dose administrations would not cause him serious harm.  Plaintiff has made no effort to "resort to the contemporary standards of the medical profession" or "produce opinions of medical experts" to create any genuine dispute that Waits's decision to rescind his Suboxone was "so grossly contrary to accepted medical practices as to amount to deliberate indifference." *Adams*, 61 F.3d at 1543 (citation omitted).

For that matter, there is no dispute that Plaintiff's entry into the MAPS program was designed to assist him with opioid use recovery through behavioral therapy and reduce his opioid cravings through titrated medication.  Waits medically determined that Plaintiff was not receiving the full benefit of medication-assisted therapy and could not continue reasonable treatment of his disorder without behavioral therapy to assist his recovery.  Under these circumstances, discontinuing Plaintiff's prescription was not an "easier but less efficacious course of treatment" amounting to deliberate indifference. *Waldrop*, 871 F.2d at 1033 (citation omitted); *cf., e.g.*, *Leiser v. Hoffmann*, No. 20-2908, 2021 WL 3028147, at *3 (7th Cir. July 19, 2021) ("Dr. Hoffmann's

decisions to prescribe tramadol on a short-term basis at first and later to terminate it after reported 'cheeking' were both based on concerns about the risks of dependency or abuse, so those decisions are entitled to deference. . . . Dr. Hoffmann testified that the risks of substance abuse outweighed the risks of withdrawal, again demonstrating his use of medical judgment.").  In sum, Plaintiff has not proffered <u>anything</u> showing that Waits violated clearly established medical practices to overcome qualified immunity.

Accordingly, Defendants Waits, Mohammed, Fairclough, and Bradshaw each enjoy qualified immunity, and summary judgment is thus entered in their favor on each count of medical deliberate indifference.

## II.    Plaintiff's ADA Claim

Plaintiff's remaining claim is brought under Title II of the ADA.  Plaintiff's ADA claim is brought against the PBSO <u>only</u>.  *See* SAC at 15–16.  His allegations are brief.  Plaintiff avers that the PBSO's "policies on controlled substances have caused [him] to be denied the opportunity to benefit from [the PBSO]'s programs and services."  *Id.*  As a result, Plaintiff "ha[s] been discriminated against because of [his] highly documented disabilities."  *Id.* at 16.  However, Plaintiff has not responded to Defendant's summary judgment arguments with respect to this claim, once again waiving any opposition to them.  For the reasons below, summary judgment is granted in favor of the PBSO.

### A.  Title II of the ADA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The statute creates a private cause of action for monetary damages against a

public entity that discriminates against a qualified individual.  *See id.* § 12133; *see also United States v. Georgia*, 546 U.S. 151, 154 (2006).  However, individuals and private entities are not liable under Title II of the ADA.  *See Edison v. Douberly*, 604 F.3d 1307, 1308 (11th Cir. 2010).

"[A] disabled prisoner can state a Title II-ADA claim if he is denied participation in an activity provided in state prison by reason of his disability."  *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1081 (11th Cir. 2007).  To state a claim under Title II, a prisoner-plaintiff must allege the following three elements: "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability."  *Christmas v. Nabors*, 76 F.4th 1320, 1333 (11th Cir. 2023) (quoting *J.S., III ex rel. J.S. Jr. v. Hous. Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017)).

To satisfy the third prong, a plaintiff must show that he was treated differently than non-disabled persons by reason of his or her disability.  *See Rebalko v. City of Coral Springs*, 552 F. Supp. 3d 1285, 1328 (S.D. Fla. Nov. 3, 2020).  "An ADA claimant may proceed on theories of intentional discrimination, disparate treatment, or failure to reasonably accommodate the plaintiff's disability."  *Norman v. Jones*, No. 19-CV-4, 2019 WL 5699097, at *4 (N.D. Fla. Oct. 11, 2019), *report and recommendation adopted*, 2019 WL 5697184 (N.D. Fla. Nov. 4, 2019) (citing *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008)).

An ADA plaintiff suing a municipal entity bears a higher burden.  This plaintiff "must demonstrate that an 'official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the entity's behalf' had 'actual knowledge of discrimination in the entity's programs and failed adequately to respond.'"  *Friedson v. Shoar*, 479 F. Supp. 3d

1255, 1264 (M.D. Fla. 2020) (quoting *Silberman v. Miami-Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019)).  And, if that plaintiff pursues damages, he must also prove that the entity engaged in intentional discrimination.  "A plaintiff may prove discriminatory intent by showing that a defendant was deliberately indifferent to his statutory rights."  *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1146–47 (11th Cir. 2014).  This means that the entity knew that harm to a federally protected right was substantially likely and failed to act.  *See id.*

### B.  Plaintiff's ADA Claim Fails

In the PBSO's view, Plaintiff's limited access to the MAPS program was the result of a disciplinary measure, not a discriminatory one.  Plaintiff was no longer eligible for the MAPS program's behavioral therapy component because he had violated the West Detention Center's rules by diverting Suboxone before it was formally prescribed to him.  *See* Mot. at 23–24.  The PBSO further argues that Plaintiff "was aware" of these rules and "disregarded [them] prior to seeking entry" into the program.  *Id.* at 23.  For these reasons, "Plaintiff was not excluded from the MAPS program due to his . . . opioid use disorder."  *Id.*

The Court will recount the undisputed facts as relevant here.  When Waits assessed Plaintiff's disorder, Plaintiff's urinalysis results revealed buprenorphine in his system.  Plaintiff was nevertheless prescribed Suboxone and cleared for participation in the MAPS program— consisting of treatment via medication-assisted and behavioral therapy—to reduce his cravings.  Four days later, Fairclough was informed that Plaintiff had tested positive for Suboxone before it had been prescribed to him, which constituted a disciplinary infraction.  Plaintiff was issued a disciplinary referral, after which Perry notified Waits that Plaintiff was no longer eligible for participation in the MAPS program's behavioral therapy component due to his diversion of Suboxone.

Importantly, Plaintiff's removal from the <u>medication-assisted therapy component</u> of the program was fully entrusted to Waits's discretion, as the PBSO has never had a policy of allowing a deputy, correctional officer, or staff member to control the medication an inmate is prescribed. Further, as relevant here, there are inmates at the West Detention Center who are not in the MAPS program but still have Suboxone prescriptions where such prescriptions are deemed medically required.

As an initial matter, Plaintiff may be protected under the ADA. Ordinarily, an "individual with a disability" does not include someone "who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." 42 U.S.C. § 12210(a). But the ADA also provides that:

> Nothing in subsection (a) shall be construed to exclude as an individual with a disability an individual who—
>
> > (1) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use;
> >
> > (2) is participating in a supervised rehabilitation program and is no longer engaging in such use; or
> >
> > (3) is erroneously regarded as engaging in such use, but is not engaging in such use.

*Id.* § 12210(b). Here, Plaintiff was participating in his jail's rehabilitation program and no longer diverting Suboxone when he was removed from the MAPS program. Thus, the Court will assume without deciding that Plaintiff is a qualified disabled individual for ADA purposes. *Id.* § 12210(b)(2).

Plaintiff seeks damages against a municipal entity. *See* SAC at 18 (pursuing $25,000 from the PBSO). So, to survive summary judgment, Plaintiff must demonstrate a genuine dispute of material fact that the PBSO intentionally discriminated against him. This requires a showing that

the PBSO acted deliberately indifferent to his statutory rights, meaning that an official at the PBSO "knew that harm to a federally protected right was substantially likely" and "failed to act on that likelihood." *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 344 (11th Cir. 2012) (quotation marks omitted). This is an "exacting standard." *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1259 (11th Cir. 2010).

### 1. *PBSO's Reasonable Accommodation of Plaintiff's Disability*

Before all else, the Court must address the proper construction of Plaintiff's discrimination claim. Defendants maintain that Plaintiff is alleging he was denied access to the MAPS program by reason of his addiction to opioids. And they emphasize that Plaintiff's behavioral therapy was terminated because of Plaintiff's <u>misuse</u> of Suboxone, rather than his <u>disorder</u>.

But Plaintiff's allegations cannot be predicated simply on the denial of therapy to treat his disability. That's because Plaintiff needs to establish "that he was treated less favorably than a similarly situated, non-disabled person." *Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale*, 46 F.4th 1268, 1275–76, 1278 (11th Cir. 2022). The MAPS program is designed <u>solely</u> for disabled inmates like Plaintiff suffering from opioid use disorder. So, even though the reason for Plaintiff's removal—his diversion of Suboxone—necessarily flows from his disability, Plaintiff cannot prove under these circumstances that he was treated worse than a non-disabled person. *Cf. United States v. Univ. Hosp.*, 729 F.2d 144, 157 (2d Cir. 1984) ("Where the handicapping condition is related to the condition(s) to be treated, it will rarely, if ever, be possible to say . . . that a particular decision was discriminatory[.]").[13]

---

[13] Neither Plaintiff nor Defendants have raised (or, for that matter, briefed) how the PBSO's conduct falls under 42 U.S.C. § 12210(c). Section 12210(c) provides that "an individual shall not be denied . . . services provided in connection with drug rehabilitation [] on the basis of the current illegal use of drugs" but only where that individual "is otherwise entitled to such services." *Id.* Not a single party has addressed whether the MAPS program's behavioral therapy component constitutes "services provided in connection with drug rehabilitation"; whether Plaintiff was denied services solely due to his drug use rather than a violation of

Therefore, to fairly afford Plaintiff review on his claim, the Court must determine whether Plaintiff's exclusion from the MAPS program left him without a reasonable accommodation for his opioid use disorder. *See Kinard v. Fla. Dep't of Corr.*, No. 24-10359, 2024 WL 4785003, at *6 (11th Cir. Nov. 14, 2024) (construing a prisoner's ADA claim as alleging that the state "engaged in disability discrimination because its failure to accommodate [his] disability . . . left him unable to access programs or activities offered by the prison"); *Lonergan v. Fla. Dep't of Corr.*, 623 F. App'x 990, 994 (11th Cir. 2015) (recognizing that, although "the failure of the prison to give the Plaintiff the treatment prescribed by his dermatologist is sufficient to plead a prima facie ADA claim[,]" the finder of fact "may ultimately determine that sun block, a hat, and long sleeves sufficiently accommodate[d] the Plaintiff's condition"). But even upon this construction, no reasonable juror could find in favor of Plaintiff.

"[A] qualified individual with a disability is not entitled to the accommodation of [his] choice, but only to a reasonable accommodation." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997). And here, the Court finds that the PBSO left Plaintiff with a reasonable accommodation and, as such, its actions were not discriminatory. Recall that the MAPS program has both a behavioral therapy component <u>and</u> a medication-assisted therapy component. And the parties agree that inmates at West Detention Center receive Suboxone prescriptions when medically necessary outside the confines of the MAPS program. So, although Plaintiff was removed from the behavioral therapy component following his disciplinary referral, such removal had no impact on Plaintiff's access to medication-assisted therapy.

---

jail policy; if such denial was on the basis of his drug use, whether Plaintiff's drug use at the time of such denial was "current"; or whether Plaintiff was "otherwise entitled" to such services. *Id.* These issues are notably underdeveloped—and the Court need not reach them.

Certainly, no rational juror could find that medication-assisted therapy was not a reasonable accommodation for Plaintiff; after all, Plaintiff's four-day benefit of behavioral therapy was merely incidental to his primary objective, which was a formal Suboxone prescription to treat his opioid use disorder.  And, although Plaintiff's prescription was ultimately rescinded, the PBSO played no role in determining Plaintiff's suitability for continued medication assistance, which, instead, lay squarely within Waits's judgment.   Thus, on this record, there is no genuine dispute of material fact that the PBSO left Plaintiff with a reasonable accommodation for his disability in the form of continued medication-assisted therapy.

### 2. Plaintiff Cannot Show Intentional Discrimination

Plaintiff also cannot prove that the PBSO acted with discriminatory intent, which he must demonstrate to survive summary judgment.  As an initial matter, none of the parties have identified which Defendant qualifies as an "officer" for purposes of Plaintiff's ADA claim for monetary damages.  *See Liese*, 701 F.3d at 350 (defining an official as "someone who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a 'key decision point' in the administrative process").  And even if Defendants Sheriff Bradshaw and Fairclough could be reasonably regarded as such an officer, nothing in the record suggests that they were <u>aware</u> of discrimination in the facility and failed to respond.

Further, Plaintiff's conclusory allegations wholly fail to show the existence of a known discriminatory policy.  As already noted, the record establishes that there are individuals at the West Detention Center who are not in the MAPS program, but still have prescriptions for Suboxone where medically required.  Although Plaintiff challenges the soundness of Waits's medical judgment, he agrees that rescission of his Suboxone was <u>Waits's</u> decision.  Plaintiff further

agrees that Fairclough did not direct medical staff to rescind Plaintiff's Suboxone, and that, in fact, the PBSO has never had a policy of allowing a correctional officer to control an inmate's prescribed medication. It thus cannot be said that a PBSO official knew that Plaintiff's disciplinary infraction made it substantially likely that Plaintiff would be denied a reasonable alternative accommodation for his opioid use disorder.

For these reasons, Plaintiff has not overcome the significant hurdles required to defeat summary judgment on his ADA claim. There is no genuine dispute of material fact that the PBSO was not deliberately indifferent to Plaintiff's federally protected rights, and summary judgment is therefore appropriate.

## <u>CONCLUSION</u>

In sum, the Court concludes that there is no genuine dispute of material fact that none of Defendants' conduct amounted to cruel and unusual punishment in violation of Plaintiff's Fourteenth Amendment rights. Further, there is no genuine dispute of material fact that the PBSO did not intentionally discriminate against Plaintiff by reason of his opioid use disorder in violation of Title II of the Americans with Disabilities Act.

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendants' Consolidated Motion for Summary Judgment, [ECF No. 92], is **GRANTED**. Pursuant to Rule 58 of the Federal Rules of Civil Procedure, final judgment will be entered by separate order.

**DONE AND ORDERED** in Miami, Florida, this 9th day of June, 2025.

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record